REXFORD G. TUGWELL, GOVERNOR OF PUERTO RICO, Plaintiff and Appellant, v. BONOCIO CAMPOS SECUNDO, MAYOR OF BARCELONETA, Respondent and Appellee.

No. 15. Argued January 21, 1946.—Decided February 8, 1946.

*E. Campos del Toro, Attorney General, Luis F. Camacho,* and *Gui-llermo .A. Gil, Deputy Attorneys General,* for appellant. *Gui-llermo S. Pierluisi* and *C. II. Juliá* for appellee.

Mr. Chief Justice Travieso delivered the opinion of the court.

On October 11, 1945, the Governor of Puerto Rico sub-mitted for consideration and decision by the Municipal As-sembly of Barceloneta a statement of charges preferred by him against Bonocio Campos Segundo, mayor of that munic-ipality. The charges are, in brief, as follows:

*First:* That on September 8, 1944, the respondent, act-ing as mayor, received from Central Plazuela Sugar Co. a check for $400 as a contribution of said corporation to the pro-ject for construction and repair of the Bocas Municipal Road, under the auspices of the Municipality of Barceloneta in col-laboration with the War Emergency Program; that he un-lawfully endorsed and collected said check; and that up to September 20, 1945, he had not deposited the proceeds thereof in the municipal treasury.

*Second:* That on November 8, 1944, he received another check from the same corporation, also for $400, to be used in connection with the said Bocas Municipal Road Project; and that he unlawfully endorsed and collected said check the pro-ceeds of which he had not deposited in the municipal funds up to September 20, 1945.

*Third:* (*a*) That during the months of September, Octo-ber, and November 1944, he, acting as mayor and in violation of the provisions of § 70 of the Municipal Law, transferred to seventeen different persons, without previous authorization from the municipal assembly, lots belonging to the munic-ipality.

(*b*) That on July 28, 1944, he, likewise acting as mayor and without proper authorization from the municipal assembly,

transferred to Logia Odfélica Constancia, of Barceloneta, a lot for the construction of a temple.

(c) That he likewise transferred to Iglesia de Dios Pentecostal, Inc., of Barceloneta, a lot for the construction of a church.

*Fourth:* (a) That in July 1945, without calling for bids and in violation of the provisions of §§ 8(5) and 79 of the Municipal Law, he leased to Baldoíno Miranda certain lots and public places belonging to the municipality to be used during a patron-saint festival for the installation of games (*picas*), merry-go-rounds, and other amusements, having obtained from such grant the sum of $700.

(b) That in violation of subdivision (a), Third Section, of the Municipal Account Regulations and of § 68 of the Municipal Law, he delivered the $700 which he had received from Baldoíno Miranda to Antonio García, Treasurer of the Patron-Saint Festival Committee, who was not the municipal treasurer nor the person authorized to receive and keep said funds, nor had furnished a bond for the custody and investment of said funds.

*Fifth:* (a) That about the month of October 1944, he permitted and gave his consent to the issuance of a check for $40 in favor of Israel Núñez Román, chauffeur of the municipal ambulance, for his work during the month of October, well knowing that said chauffeur had only worked during the last fortnight of said month.

(b) That he delivered said check for $40 to the chauffeur Israel Núñez Román ordering him to endorse it and to keep the amount pertaining to the second fortnight of October returning, as he did, the sum of $20, which the respondent mayor appropriated to his own use, without depositing it in the municipal treasury, thus defrauding the municipality.

*Sixth:* That during the period from July 1944 to September 1945, with the deliberate purpose of evading the provisions of § 10 of the Municipal Law, he sold milk to the Munic-

ipality of Barceloneta at the rate of 14¢ per liter by making it falsely appear that José Tirado was the owner of said milk; all of which was prejudicial to the financial interests of the municipality, since the prevailing price of milk in the local market during the aforesaid period was 12¢ per liter.

The hearing of the charges before the Municipal Assembly of Barceloneta began on October 30, 1945, and continued during November 1, 8, and 21, 1945. On December 3, 1945, the assembly adopted a resolution acquitting the respondent mayor of all charges. The Governor thereupon took the present appeal, which he based on the following legal grounds:

1. That the municipal assembly committed grave error in refusing to put in possession of their offices as members of the assembly, the Assemblymen Encarnación Andino and Ramón Marías Santana, who had been duly appointed by the assembly itself, thereby depriving both the aforesaid assemblymen of their right to participate as such in the hearing and determination of the charges preferred against the mayor.

2. That the municipal assembly committed serious and grave error in weighing the evidence and in adopting a resolution contrary to law and against the weight of the evidence introduced.

We will refrain from discussing the first assignment. The appellant himself admits in his brief, and so stated in his oral argument, that the error in question "lacks capital importance or significance."

Let us now proceed to examine the evidence in order to determine whether the assembly erred in weighing the same. We will take up first the evidence for the complainant:

1, 2. In order to establish the first two charges, the prosecuting attorney introduced the witness Rafael V. Urrutia, Director of the Division of Operations of the W.E.P. He stated:

That the work of repairing the Bocas Road began on August 16, 1944, and ended in September 1945, an interruption

having occurred from February 28 to March 23, 1945, due to the fact that the funds originally appropriated by the W.E.P. had become exhausted; that the records failed to show that the mayor had notified the employees of the W.E.P. regarding the donation made by Central Plazuela; that at the time the road repairing began the witness was not in charge of the project; that he did not know whether the mayor had communicated with the person in charge of the work; that the witness took charge of the work on May 1, 1945; that it did not appear from the records whether the mayor had been notified that the funds were exhausted; and that he did not know whether the mayor had informed the person in charge of the work regarding the donation of $800 which he had received.

3. (a) The parties stipulated that the municipal assembly had at no time authorized the transfer of the lots to any one of the seventeen persons mentioned in this charge.

3. (b) Domingo Pérez Hernández, Justice of the Peace of Barceloneta, acknowledged as his own the signature appearing at the end of an affidavit made by Bonocio Campos Segundo, Mayor of Barceloneta, transferring a lot to Logia Odiélica Constancia. He stated that this document was sworn to and subscribed before him by the mayor. Said affidavit was admitted in evidence, and it reads as follows:

"Permit granting a lot to Resp. Logia Constancia of Barceloneta No. 11299. By this instrument, and in the exercise of the authority granted to me by the Municipal Law, I transfer the ownership of the lot which adjoins the house owned by José Ortiz, Jr., now occupied by Felipe Sánchez, to the Resp. Logia Constancia of Barceloneta No. 11299. All which I gladly sign, this 24th day of July, 1944. Signed: Bonocio Campos Segundo, Mayor. Sworn to and subscribed before me this 28th day of July, 1944. Signed: Domingo Pérez Fernández, Justice of the Peace. Affidavit No. 31135. Official seal."

The parties stipulated that the municipal assembly had never authorized the mayor to transfer the lot to Logia Constancia.

3. (c) In order to establish this charge the district attorney introduced Rafael Anglade, who testified that he was a gospel preacher of the Pentecostal Church in Barceloneta; that in April or May 1944, the witness spoke to Mayor Campos regarding the transfer of a lot situated in Giorgetti Street for the purpose of building a church thereon; that the mayor made a verbal transfer and then the church was built; that he did not pay anything for said transfer or sign any deed or instrument whatsoever. Upon being asked whether he knew that the lot which had been transferred to him by the mayor belonged to the municipality, he answered that he had adressed a petition to the municipal assembly for the transfer of the lot and that the assembly had not even extended to him the courtesy of a reply; that he then conferred with the mayor and the latter gave him the permit. Upon hearing the statement of the witness, the president of the assembly made the following statement for the record: "At no time has any permit been given to anybody, for the reason that we are not aware that the municipality holds title to that land so as to give it authority over those lots."

4. In support of charge No. 4, the district attorney introduced the testimony of Jesús M. Rivera, Municipal Secretary-Auditor, who stated that neither in the month of July 1945, nor at any time prior thereto, was there a public auction held for the purpose of leasing lots or streets belonging to the municipality to Baldoíno Miranda; that the assembly had not authorized the leasing of streets or lots to Miranda; that there was no entry in the books showing that the money paid by Miranda had been deposited. That the mayor had never delivered to the witness a statement of the expenses incurred or disbursements paid out of the funds acquired from the grant made by the mayor to Miranda.

Baldoíno Miranda testified that prior to June 6, 1945, the mayor had talked to him and asked him to take charge of the patron-saint festival because no one liked to bid for the work;

that the mayor told him that at former festivals he had not been able to get any merry-go-rounds and for that reason he wanted the witness to take charge of the matter; that the festival committee had called upon him and authorized him to place the apparatus in Giorgetti Street; that he did not enter into any contract with the committee which was composed of the mayor and other residents of the town; that he did not contract with the mayor; that it is true that he gave $700 and afterwards $50 additional for the benefit of the festival; that the $700 constituted the whole proceeds obtained from the festival after paying $500 for the lease of the apparatus; that he did all this out of his desire to co-operate and not in order to make any profit and that he had not earned a cent; that after the festival had ended he delivered the $700 to the mayor; that he gave this money in order to cover the festival expenses.

Antonio García, Treasurer of the Festival Committee, testified that he had charge of the funds which had been collected amounting to $1,200; that neither the mayor nor any other person had asked him to deposit those funds in the municipal treasury; that the $700 entry in his notebook "for lease of the lots for games and machines to Pepe Miranda" had been made by him on his own initiative without any suggestion on the part of any member of the committee; that for the last twenty-five years he had served as treasurer of the patron-saint festival; that during several years the lots had been leased without fulfilling the legal requisites; that the important thing was that he had entered in his notebook the amount delivered to him; that he gave the mayor a written statement of the receipts and disbursements; that the mayor had requested that statement one or two months before the arrival of the inspector from the office of the Auditor; that the balance amounting to $302 was deposited by him in the municipal treasury on September 19, 1945, after the arrival of the inspector; that it was the inspector who told him

to deposit those funds in the municipal treasury; that he did not make any entry in his notebook regarding the $50 covering the extra day during which the games were operated in the town lots.

5. The evidence introduced to establish charge No. 5 was as follows:

Israel Núñez, chauffeur of the municipal ambulance, testified that he started to work as chauffeur on October 16, 1944; that at the end of October the mayor sent for him and told him: "Here is a check for $40; get that check, sign it, and after cashing it bring me back $20"; that the witness cashed the check and delivered the $20 to the mayor personally. The check was identified by the witness and admitted in evidence. The pay roll from which it appeared that Núñez had collected $40 as chauffeur of the ambulance was also admitted in evidence. The pay roll was signed by the Director of Charity and approved by the mayor. The witness went on to testify that he worked for the municipality until November 26, 1944; and that he did not work during the month of December. On cross-examination by the respondent, he stated that the mayor had told him that the $20 which he must bring back was "to be covered into the municipal fund"; that this statement was made in the presence of six or eight persons who happened to be there; that Bonocio Campos had discharged him from his employment because he had heard certain lies regarding the absence of the witness from his post in the ambulance; that the mayor scolded him for delays in the trips.

The municipal treasurer testified that up to the time of his testimony the mayor had not deposited in the municipal treasury the $20 which Núñez had received as an excess payment.

6. In support of the sixth charge, the district attorney called the respondent mayor as a witness, who stated that he had known José Tirado for several years; that he had never

had any dealings with Tirado but that a son of his had sold a business establishment to the latter; that afterward Tirado sold the same business to a daughter of the witness; that in September he was informed that Tirado was selling milk to the municipality; that he knew that Tirado had a contract with the Superintendent of the Hospital for supplying milk to the patients, such service having started in June or July 1944, when he purchased said business; that the witness had been told that his daughters, who own several cows, sold milk to Tirado and that other persons did likewise; that he had not had any dealings whatsoever with Tirado. The district attorney showed the witness five checks issued by the municipality in favor of José Tirado, for various sums in payment of milk supplied to the municipal hospital during the months of August, September, November, and December 1944, and in April, May, and July 1945. All these checks appear to have been endorsed by José Tirado and by the respondent Bonocio Campos Segundo. The respondent admitted as his own the signatures appearing on the checks. The latter were admitted in evidence.

The respondent went on to state that the manager of the hospital had told him that Tirado was the one who supplied the milk; that he had never contracted with Tirado and that the contract was made by the manager; that in his capacity as mayor he had signed the warrants, including those pertaining to Tirado; that he was under the impression that for sometime the price of milk had been 14¢; that he did not know what was the price fixed by the O.P.A., as the manager had charge of that.

José Tirado Rodríguez testified that in August 1944, he purchased from Bonocio Campos, son of the Mayor of Barceloneta, a commercial establishment; that in November of the same year he sold said establishment to a daughter of the mayor; that since August 1944, he started to do business with the municipality, by supplying milk to it at 14¢ per liter; that

he continued in said business until November 1944; that after he had sold the establishment to the daughter of the mayor he continued selling milk to the municipality at 14¢; that he purchased the milk from the son of the mayor, known to him as Bonocio Campos Segundo, at 12¢ per liter; that at the time of his testimony he was still engaged in that business; that a helper employed by the hospital fetched the milk from the establishment which formerly belonged to the mayor and now belongs to his daughter Iris Esther Campos; that the daughter of the mayor was the one who sold him the milk at 12¢ but that he did not know what was the amount sent by her to the hospital; that he did not pay the helper who carried the milk or furnish the milk cans used for this purpose; that he learned of the amount of milk furnished monthly through the monthly statements supplied to him by the hospital.

On cross-examination by the respondent, he stated that it was the manager of the hospital who spoke to him about the milk contract; that since then he had been furnishing eight liters daily which he purchased from the daughter of the mayor; that formerly he purchased it from other persons; that the witness was the one who benefited directly from said contract and that the mayor had no interest in the business.

Answering questions put to him by the district attorney, he stated that the mayor knew that the witness purchased the milk from his daughter at 12¢ and sold it to the hospital at 14¢ per liter; that he knew that the hospital consumed eight liters daily because they told him so; that the only thing he did was to collect the money for the business which he had with the municipality; that he used the checks which he received from the municipality in order to pay for purchases made by him in the store belonging to the daughter of the mayor.

Jesús M. Rivera, Municipal Secretary-Auditor, testified that he, jointly with the mayor, signed the warrants covering

payment of the milk for the hospital; that the invoices were delivered sometimes by Tirado and sometimes by the mayor.

The district attorney introduced in evidence the Regulations of the Office of Price Administration which fixes at 12¢ per liter the price for milk supplied to the hospitals.

We will now make a summary of the evidence introduced by the respondent.

The witnesses Mario Olmo Ferrán, a farmer, Bernardo Soler, Acting Manager of Central Plazuela, and Blanca M. Marchán, a poetess, confined themselves to the statement that the respondent enjoys a good reputation in the town of Barceloneta.

Ramonita de Jesús testified that she was the manager of the municipal hospital from the year 1941 to July 1945; that it was she who had talked with José Tirado in order to see whether the latter could supply milk to the hospital; that everything that concerned food was a matter within her jurisdiction as manager; that she never spoke to the mayor regarding the milk business because he did not use to handle such matters; that from July 1944 to July 1945, when she resigned from her position, the milk was furnished by Tirado.

Upon being questioned by the district attorney, she stated that it was not the mayor but the Director of Charity, Dr. Bernal, who had authorized her to make the milk contract; that she sent for the milk to the establishment which Tirado had on the ground floor of the mayor's house; that she did not know whether the establishment belonged to Tirado or to the mayor but that she purchased the milk from Tirado.

Julio Martínez de Andino, Area and Field Engineer of the W.E.P., testified that he served as engineer for the District of Arecibo and it was incumbent upon him, as such engineer, to supervise the finishing of the Bocas Road Project; that in March 1944, Mayor Campos submitted to the W.E.P. a project involving the sum of $18,000; that the witness prepared the project; that on February 28, 1945, the work of the

laborers was stopped as funds had become exhausted, but materials continued to be received for the work which was not wholly suspended; that the project was stopped when reaching a bridge which chould not support the weight of a 10-ton steam roller and the latter could not pass through any other place; that on one occasion Mayor Campos, accompanied by Tomás Dávila, came to see whether the surplus funds for the Bocas Road could be used for the Piche Road and during the conversation the mayor told Dávila that they could use that surplus and with the money derived from the $800 donation made by Plazuela they could build the Piche Road.

On cross-examination by the district attorney, he stated that the amounts appropriated for the project were $18,000 from the W.E.P. and $2,000 from the municipality; that $6,500 was appropriated for wages, $1,500 for supervision, and $10,900 for materials; that the item for wages did not become exhausted because the project was active only for a week; that after a week of work the project endorsed by the W.E.P. and the municipality was substituted by another project of the Department of the Interior which was based on the same figures; that for the new project the Department of the Interior contributed the $2,000 which the municipality had offered for the original project; that the witness continued to be in charge of the supervision of the project; that it was after the work continued under the new project that the item for wages became exhausted, due to the fact that the Department of the Interior had recommended that the road be given a width of 4½ meters, that is, one more meter than the width fixed by the original project; that it was necessary to suspend the work from February 28 to March 23, 1944, because the item for wages had become exhausted; that the only time that the mayor had mentioned to him the donation made by Plazuela was at the conference with Dávila; that after the Department of the Interior had endorsed the project, the municipality had nothing to do with it.

Antonio Rodríguez Avilés, owner of a gasoline pump station, testified that he sold gasoline to the municipality; that during the month of October 1944, he furnished gasoline to Israel Núñez by order of the mayor; that he cannot tell the exact dates but that he furnished it in October; that at the end of each month he sent the bill to the auditor together with the order slips which the municipality issues every time that gasoline is furnished; that he did not know the precise date on which he furnished the gasoline but that this particular might be shown by the order slips. The witness was unable to state definitely whether he had supplied gasoline to Israel Núñez during the first fortnight of October.

After the close of the evidence for the respondent, the district attorney introduced the following oral evidence:

Bonocio Campos Segundo, the respondent mayor, testified that he had held the office of mayor since 1940 until he was suspended from office and pay by the assembly by reason of the complaint herein; that he knew Miguel J. Arzuaga, Manager of Central Plazuela, then sojourning in Europe; that sometime in September 1944, the witness, in his capacity as a friend and not as mayor, called on Arzuaga for the purpose of procuring $1,000 for repairing the Boca municipal road; that the work was to be done under the direction of the W.E.P. and of the witness in his capacity as a friend and collaborator of the people and friend of Arzuaga; that it was incumbent upon him to administer the donation made by the Central; that said donation was made to him personally and not to the Municipality of Barceloneta; that he had called on the W.E.P. in order to advise the latter that they wished to repair the road, and that he did this in his capacity as mayor; that the Director of the W.E.P. told him that he must obtain a donation before the War Emergency Program could undertake the work; that as the municipality lacked funds, he talked to Fano Vanga and to the Manager of Plazuela and asked them for a donation of $1,000; that he took this step in his capacity as a

private individual and not as mayor; that, subsequently, and prior to October 1944, he informed the office of the W.E.P. that he had obtained a donation from a private entity; that he had submitted a project to the W.E.P. in March 1944, when he thought the municipality had funds available for the work; that under said project the municipality undertook to contribute the sum of $2,000; that at the time the Department of the Interior donated the $2,000—from September 10 to 16, 1944—he already had in his possession the checks from Plazuela for $400 each and "then I retained the $800 for safekeeping"; that the road was repaired with funds supplied exclusively by the W.E.P. and the Department of the Interior; that it was in December 1944 or January 1945 that he learned for the first time that the Department of the Interior had donated the funds for continuing the work. The witness identified the two checks received by him from the Manager of Central Plazuela on the dates shown therein, and he repeated that he had received them in his private capacity and not as mayor. In the margin of each check it is stated that the same is a "contribution for the construction of La Boca Road."

The witness went on to state that he had cashed each of said checks several days after receiving them and deposited the money in his house in a safe pending determination of its use; that he did not deposit the money in the municipal safe because Mr. Arzuaga had not given it to him for delivery to the municipality but to spend it on the work if necessary; that he was aware of the regulations which require that donations to the municipality should be covered into the municipal treasury, but that this requirement applies only to a donation made to the municipality for a municipal work and not to a donation made by a private individual, not to the municipality, but for any project, where the donor does not require that the money be covered into the municipal funds; that the Central had made him personally responsible for the money and that for this reason it was untouched; that he did

not recollect or know whether on November 8, 1944, the date on which he received the second check, the Department of the Interior had already taken charge of the work; that at the time he received the second check he had not spent any part of the first $400; that he accepted the second check in the expectation that the W.E.P. would call upon him for the materials which he had undertaken to furnish for the work; that he knew that he had collected both checks together; that he did not remember whether he had cashed them at the same time; that he did not remember whether he had advised the W.E.P., the municipal treasurer, or the assembly of the receipt by him of a donation; that when he deposited the money in his safe he did not place any mark thereon or attach any note thereto which might serve to identify it as a donation made by Plazuela for the purpose already indicated.

Upon the witness expressing a desire to explain something, he was allowed to do so, and he said:

"I have sent for the money—that $800—which was wrapped up, which is still in the safe, in the same envelope I placed it at the bank, and which I returned from my private or checking account to Central Plazuela. I have just sent for the package containing the money so that you may see it, and examine it, and see how the money is."

He went on to testify that his daughters knew that the $800 dollars placed in the safe was the donation from the Central and that for this reason he had taken no precautions anticipating the case of his death; that he returned the money to Plazuela on October 6, 1945, when the inspector from the office of the Auditor had already started an investigation; that it is true that he had submitted his resignation to the Governor but that he did this, not because of any fear of the charges, but at the instance of his friends and of Muñoz Marín.

At the hearing the respondent exhibited to the assembly the envelope containing the $800 in 40 bills of $20 each. The

mayor stated that those were the same bills which he had received from the bank; and that he had returned the money to Plazuela in a check in order to be able to bring the bills before the assembly and through them prove that he had not disposed of the money.

The district attorney introduced as his principal witness the respondent mayor himself, who testified extensively and in detail in answer to a lengthy interrogatory from his accusers which tended to get the witness to make incriminating admissions. The conflict between the testimony of the respondent, a witness of the district attorney, and that of the other witnesses for the complainant, and the conflict in the evidence taken as a whole, were decided by the municipal assembly by according credit to the testimony of the respondent and of his witnesses. We fail to perceive any reason which would warrant us in interfering with the decision of the assembly, which saw and heard the witnesses testify and which was in a better position than we are to pass upon their credibility.

Although we are of the opinion that the resolution of the municipal assembly should be affirmed, we wish to state that such an affirmance should not at all be construed as an approval by this court of the conduct of the respondent mayor in connection with the facts set forth in the charges preferred against him.